UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

LARRY W SIMS #294498                        CIVIL ACTION NO. 18-cv-1038

VERSUS                                      JUDGE FOOTE

W S SANDY MCCAIN                            MAGISTRATE JUDGE HORNSBY

**REPORT AND RECOMMENDATION**

**Introduction**

Larry W. Sims ("Petitioner") was charged with second-degree murder. A Caddo Parish jury unanimously convicted him of the responsive verdict of manslaughter, and he received a maximum sentence of 40 years at hard labor. The conviction and sentence were affirmed on appeal. State v. Sims, 162 So.3d 595 (La. App. 2d Cir. 2015), writ denied, 186 So.3d 1161 (La. 2016). The state court also denied a post-conviction application.

Petitioner next asserted several claims in a federal habeas corpus petition. The court pointed out that Petitioner did not exhaust his state court remedies with respect to several of the claims. Doc. 10. Petitioner responded that he wished to dismiss the unexhausted claims. Docs. 11 & 12. The remaining claims are (1) ineffective assistance of counsel based on (a) failure to suppress pretrial identification (c) waiving critical defense witnesses without Petitioner's authorization, and (g) waiving the presentment of several witnesses that could have exonerated Petitioner; (2) prosecutorial misconduct related to DNA testing;

and (5) the State withheld material, exculpatory evidence.[1]  For the reasons that follow, it is recommended that the petition be denied.

**Background Facts**

Brenda Price lived in a trailer with her 11-year-old son, S.J.  Ms. Price and Nelson Varela were in the early stages of a relationship, and Varela came to their house one Friday evening in November 2011.  S.J. fell asleep on the couch while watching television in the living room.  Ms. Price and Mr. Varela played a drinking game (quarters), smoked some crack, and had sex in Price's bedroom.  Varela then went into S.J.'s room and passed out.

Ms. Price testified that Petitioner came by the house later that night (or early the next morning).  He left, only to return later, and Ms. Price left with him.  They drove five to seven minutes to a house where Petitioner stayed with others.  Price estimated that she left her home at about 3:00 a.m. to 4:00 a.m.  When they arrived at the other house, Price and Petitioner smoked crack and drank a couple of beers.

About 30 or 45 minutes later, Price heard Petitioner on the phone, and he said that he had to take someone to the bank.  Ms. Price asked Petitioner if he would drop her off at her home on the way.  Petitioner said no, told her to wait, and said he would be back in about five minutes.  Price said she waited and waited, then she borrowed a phone to call her house, but no one answered.  Around daylight, after waiting from an hour and a half to

---

[1] The numbering used by Petitioner in his petition and his memorandum are slightly different, so there was some confusion regarding whether he wished to dismiss as unexhausted a claim regarding the trial judge piercing the veil of judicial partiality or the Brady-type claim listed above as number 5.  Petitioner clarified in Doc. 12 that he wished to dismiss the veil of judicial partiality claim and pursue the Brady-type claim.

two and a half hours, she started walking home. A woman stopped and gave her a ride to her home, where she found it surrounded by police.

S.J., by the time of trial, was 13 and in the seventh grade. He testified about falling asleep on the couch while watching television. He said that he woke up to the sound of fighting. He saw "the Mexican" (Varela) on the bed, and a man was standing over him pointing a gun at him and saying either "give me my money" or "give me your money." S.J. said he did not see Varela with any weapons. He later told police the attacker was a black male with a grayish beard. Varela kept trying to escape, but the other man kept pushing him back in the room. S.J. ran, heard a shot, hid in the house for a while, then went out the back door and called the police from a neighbor's home.

S.J. was asked to describe the attacker. He said he "had like kind of like a little hair right here (indicating)" and was black. S.J. was asked how well he saw the man. He said, "I saw like a portion of his face and the side of him." S.J. estimated that he saw the attacker for "like maybe seven seconds." He recalled being shown two or three photo lineups, and he remembered picking someone out of the second one. S.J. was asked if he saw the attacker in court, and he pointed to Petitioner.

Detective Shonda Holmes was the lead investigator. She testified that officers took Ms. Price back to the home where she spent time with Petitioner that night, but he was not there at that time. Based on information that Detective Holmes gathered, Petitioner became a suspect. Holmes put together a photo lineup that consisted of photos of Petitioner and five other men with similar facial features.

The first lineup showed the men with a frontal facial view, with the men looking directly at the camera. It was shown to S.J., who did not identify anyone in that lineup. The second lineup consisted of six men who were not all the same as those in the first lineup. Both lineups had in common photos of Petitioner and one other man, but the other four men were different. In the first lineup, Petitioner was number two, and in the second lineup he was number six. The second lineup showed photos of the left side of each man's face, which was consistent with S.J. saying he saw only the attacker's profile. Detective Holmes testified that S.J. first picked two people from the second lineup and said they looked alike, "but it was more of this person." That person was Petitioner.

Detective Holmes testified that the initial call for this crime was made at 5:53 a.m. The parties stipulated that, if called to the stand, a friend of Petitioner would have testified that she phoned the defendant at about 5:30 a.m. to ask him to take her to an ATM on Mansfield Road, that he complied with her request, and that he then took her home. The woman's three ATM receipts were admitted into evidence. They were dated November 19, 2011 and time-stamped 6:34 a.m., 6:35 a.m., and 6:35 a.m. Also admitted were still photos taken by a security camera at the ATM, which showed the woman making her transactions; Petitioner's car was visible in the background. The defense also introduced Petitioner's booking photo, which was taken after his arrest on November 20, the day after the murder. While Petitioner did not have a full beard in the photo, he does have facial hair around his mouth. Furthermore, the hair under his mouth appeared to be gray.

**Ineffective Assistance of Counsel**

    **A. Introduction**

Petitioner argues that his attorney rendered ineffective assistance of counsel in several ways. To prevail on such a claim, Petitioner must first establish both that his counsel's performance fell below an objective standard of reasonableness and that, had counsel performed reasonably, there is a reasonable probability that the result in his case would have been different. Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984). The state court denied the Strickland claims on the merits.

    **B. Habeas Burden**

Petitioner's claim was adjudicated and denied on the merits by the state court, so 28 U.S.C. § 2254(d) directs that the question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether the determination was unreasonable, which is a substantially higher threshold. Schriro v. Landrigan, 127 S.Ct. 1933, 1939 (2007). The Strickland standard is a general standard, so a state court has even more latitude to reasonably determine that a defendant has not satisfied it. The federal court's review is thus "doubly deferential." Knowles v. Mirzayance, 129 S.Ct. 1411, 1420 (2009). For the federal court to grant relief, "[t]he state court decision must be so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Woods v. Etherton, 136 S. Ct. 1149, 1151 (2016) (per curiam) (quotation marks removed).

"If this standard is difficult to meet, that is because it was meant to be." Harrington v. Richter, 131 S.Ct. 770, 786 (2011). Section 2254(d) "stops short of imposing a complete

bar on federal court relitigation of claims already rejected in state proceedings" and reaches only "extreme malfunctions" in the state criminal justice system. Id. Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id.

### C. No Motion to Suppress

Petitioner argued in his post-conviction application that trial counsel, Mary Harried, was ineffective because she did not file a motion to suppress the identification testimony by S.J. Petitioner argues that S.J. never actually identified Petitioner as the killer, before or after the lineups, and the testimony was tainted by coaching and other alleged wrongdoing in connection with the lineups.

The State's response to the post-conviction application included an affidavit from defense counsel, who testified that she "did not fail to file a motion to suppress." She stated that a motion to suppress is filed when there is an allegation that evidence was unconstitutionally obtained, and the evidence obtained in this matter "was obtained pursuant to warrant and/or consent." Counsel did not specifically address any motion to suppress the identification testimony. Tr. 1399.

The trial court noted this claim and various other ineffective assistance claims, recited the Strickland elements, and summarily determined that Petitioner failed to show deficient performance or prejudice. Tr. 1470-71. Petitioner applied for a writ to the appellate court. He argued that the trial court should have granted an evidentiary hearing. His application mentioned some of his particular claims, but this one was not mentioned. The appellate court summarily denied the application on the showing made. Tr. 1801. Petitioner then filed an application with the Louisiana Supreme Court, and that application

did include an argument for a Strickland claim based on no motion to suppress the identification evidence. Tr. 1803, 1812-15. The Supreme Court denied the application in a per curiam that stated he "fails to show that he received ineffective assistance of counsel under the standard of Strickland and failed to satisfy his burden of proof in general." Tr. 2184-86.

The State argues that Petitioner did not properly exhaust his state court remedies on this claim because he did not present it in his writ application to the appellate court, meaning that the claim is procedurally defaulted. The court need not decide the procedural bar issue if it instead chooses to deny the claim on the merits. King v. Davis, 883 F.3d 577, 585 (5th Cir. 2018); Glover v. Hargett, 56 F.3d 682, 684 n.1 (5th Cir. 1995). That is the course that will be followed here, and the court will apply the deference due under Section 2254(d) because the claims did receive state court decisions on the merits in the state trial court and supreme court.

The Due Process Clause may require suppression of an eyewitness identification if it is tainted by police arrangement. Due process concerns arise only when law enforcement uses "an identification procedure that is both suggestive and unnecessary." Perry v. New Hampshire, 132 S.Ct. 716 (2012), citing Manson v. Brathwaite, 97 S.Ct. 2243 (1977) and Neil v. Biggers, 93 S.Ct. 375 (1972). To be impermissibly suggestive, the procedure must give rise to a very substantial likelihood of irreparable misidentification. Neil, 93 S.Ct. at 381. It is not enough that the procedure may have in some respects fallen short of the ideal, and suppression of the resulting identification is not inevitable even if the procedure was unnecessarily suggestive. Sexton v. Beaudreaux, 138 S.Ct. 2555, 2559 (2018). Instead,

the courts must assess, on a case-by-case basis, whether improper police conduct created a substantial likelihood of misidentification. Id.

S.J. testified at trial about what he saw of the attacker, including the angle and the length of time he viewed him. S.J. also gave a general description of the black man, including facial hair. Detective Holmes testified about the lineup procedures and how S.J. indicated that Petitioner was the man he saw.

The record includes a transcript of the lineup discussion. It started with Holmes saying that they were going to show S.J. a "face to face lineup" and to see if he could "pick him out as best as you can" the man he saw arguing with his babysitter. An officer asked S.J. if he got a look at the front of him, facing straight at him. S.J. said not really, and the officer asked if it was "just on the side or what?" S.J. said it was on the side, so the officers said they would try some side view shots "and if you're not sure, that's fine, ok?" S.J. said, "This one kind of looks like it and this one kind of does, too, but I think it's more of this one than this one." Later he said, "This one kind of looks like the one I saw at home and this one looks more like the one I saw." It is difficult to tell, from a cold transcript, exactly what the last comment meant. The officers indicated that S.J. had "just showed us more of number six" and that was Petitioner. Tr. 1120-21.

The record does not support Petitioner's argument that the lineup procedure included coaching or other impermissibly suggestive tactics. It was perhaps unusual that the two lineups repeated only two photos, but perhaps profile views were not available of all of the men in the first lineup. Otherwise, the procedure appears to be fairly run of the mill, and the transcript does not support the claim that the officers coached or directed the

witness. The state court denied the related Strickland claim, and there is no basis to determine that the decision was such an unreasonable application of Strickland as to allow habeas relief under Section 2254(d).

This conclusion is supported by Sexton v. Beaudreaux, in which the Supreme Court reversed an appellate court that granted habeas relief in a similar setting. A witness was shown a six-photo lineup and identified the defendant's picture as "closest" to the gunman. The officers later found another photograph of the defendant that was taken closer to the date of the shooting. They showed the witness a second photo lineup, which contained the different picture, and the witness again identified the defendant and said the second picture was "very close." The witness still declined to positively state that the defendant was the shooter, saying there were a few things he remembered about him that would require seeing him in person. When the witness did see the defendant in court, and witnessed how he walked, he said he was sure that the defendant was the shooter.

The Supreme Court reviewed the law discussed above and held that habeas relief was not permissible because the state court could have reasonably concluded that the petitioner failed to prove that, under the totality of the circumstances, the identification was unreliable. The Court reminded the lower courts that "deference to the state court should have been near its apex in this case, which involves a Strickland claim based on a motion that turns on general, fact-driven standards such as suggestiveness and reliability." Sexton, 138 S.Ct. at 2560. The Court also noted that it has held only once that pretrial identification procedures violated the Due Process Clause. That was in a case where the police used two highly suggestive lineups and a one-to-one confrontation that made it all but inevitable the

witness would identify the defendant. That was certainly not the case here. The principles set forth in Sexton and related decisions require the denial of habeas relief with respect to this claim.

### D. Other Claims

Petitioner's memorandum filed with this court lists his several Strickland claims on page two. They include issue (1)(c) "waiving without petitioner's knowledge or authorization, the presence of critical defense witnesses contrary to petitioner's previously discussed choice and based on the case facts" and (g) "waived the presentment of several witnesses that would have exonerated petitioner[.]" Petitioner briefed these claims to some extent in his post-conviction application. Tr. 1087-88, 1093-94. His brief filed with this court, however, contains no additional mention of these claims. Both are listed as part of claim 1, but the brief's discussion of claim 1 is devoted solely to the lineup/identification challenges.

The failure to brief these claims warrants denying them as waived or abandoned. Lookingbill v. Cockrell, 293 F.3d 256, 263 (5th Cir. 2002) ("Where a habeas petitioner fails to brief an argument adequately, we consider it waived."); Pea v. Cain, 2017 WL 1197872, *12 (M.D. La. 2017) (collecting district court decisions that found waiver where a habeas claim was not adequately briefed). All of the other ineffective assistance of counsel claims were voluntarily dismissed as unexhausted.

## DNA Evidence

Petitioner's issue number two asserts that there was prosecutorial misconduct based on the State's "disregards for developed DNA and forensic evidence, improperly

influencing the jury verdict, knowingly causing manifest injustice." Petitioner's brief on this point argues that "the DNA testing performed by the State was wholly insufficient and, that if proper testing is performed there would be clear and convincing evidence that the petitioner is factually innocent of these crimes." Petitioner also argues that the prosecution violated its duty under Brady to disclose evidence favorable to the defense. The record does not support these arguments.

Dr. Traylor performed the autopsy. He stated that the bullet entrance wound was fired from six to 18 inches distance. He also described how he took fingernail clippings and scrapings from the victim. The victim's clothes were also collected. Tr. 731-60. Monnie Michalik performed the forensic DNA analysis for the crime lab. She testified at trial about how various items of clothing, a firearm, a beer can, and other items were tested and compared to reference samples from Petitioner and the victim.

None of the DNA evidence linked Petitioner to Varela's murder. Fingernail scrapings and the swab of the fingernails from the right hand of the victim were consistent with a mixture from two individuals. The major contributor was the victim. The other contributor yielded an incomplete profile, but the analyst excluded Petitioner as the contributor. Testing of the left hand was also consistent with a mixture, with the major contributor an unknown female and the minor contributor consistent with the victim. Petitioner was excluded as a possible contributor. Tr. 780-802. Petitioner's clothing was tested for blood, but none was found. Tr. 808-09.

Petitioner claims that the State violated his rights under Brady v. Maryland, 83 S.Ct. 1194 (1963) when it did not disclose certain DNA evidence to the defense. Brady held that

"the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. 83 S.Ct. at 1196-97. To establish a Brady claim a petitioner must establish that the evidence was (1) suppressed, (2) favorable, and (3) material. Wright v. Quarterman, 470 F.3d 581, 591 (5th Cir. 2006).

The state trial court issued the last reasoned decision on this issue. The court noted the three elements of a Brady claim and held that "Petitioner has failed to establish a Brady violation" by showing that the elements were present. Tr. 1471. Because this claim was decided on the merits by the state court, Section 2254(d) bars this court from granting an application for habeas relief with respect to the claim unless the adjudication was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court. In other words, Petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair minded disagreement." Harrington v. Richter, 131 S.Ct. 770, 786-87 (2011). See also Pitonyak v. Stephens, 732 F.3d 525, 532-33 (5th Cir. 2013) (applying Section 2254(d) to a Brady claim).

Petitioner cannot establish that any DNA evidence was suppressed. The crime lab analyst testified at trial and was cross-examined by defense counsel about the DNA evidence, which was favorable to the defense. The record also shows that the prosecution's discovery responses served on the defense before trial included the lab reports detailing the DNA testing of the several items that were collected during the investigation, including the fingernail scrapings and swabs from the victim's hands. Tr. 471-77; 494-507.

Petitioner argues that another crime lab analyst, Pat Wojtkiewicz, also conducted DNA testing and could testify that the killer's DNA was discovered on the victim and that the State had reason to believe that the DNA belonged to a person in a national DNA database. Petitioner does not point to any evidence in the record to support this claim, and this court's review of the state court's decision is "limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 131 S.Ct. 1388, 1398 (2011). Petitioner's conclusory assertions that helpful DNA evidence was not provided to the defense is not supported by anything that he has pointed to in the state court record. Accordingly, the state court's denial of this claim was reasonable, and habeas relief is not permitted.

**Other Claims**

Petitioner's final claim asserts that the State "withheld material exculpatory evidence, and evidence which could have been used to impeach the State's entire case, the suggestive identification procedure, and to bolster the forensic evidence and exonerate the defense." The actual argument on this issue lists various persons and asserts that they could have offered testimony that the jury would have found "helpful" in assessing the case.

Petitioner identifies Lucky Raley, who he says "did find the real killer and did take a picture of him." He lists Brenda Price, who he says would have testified that she knew who the killer was and that his name was David. Also listed are Officer Bonnie Miller and Officer McDonald, who are said to have interviewed the trailer park manager, S.J., and other witnesses. Petitioner states that one of those other interviewed witnesses is Hosea

Norlande, an eyewitness who "saw the killer leaving the scene" and would have helped the defense.

The State argues that this claim is not exhausted because Petitioner did not present the same claim to the trial court and state appellate court in his post-conviction application. His claim in the trial court was that these witnesses "should have been put on the stand to testify." Tr. 1107. In the Supreme Court, he referred to similar facts but called them suppressed evidence and invoked Brady and Napue. Tr. 1827-30. The exhaustion defense may have legs, but the court elects to address the claim on the merits. See 28 U.S.C. § 2254 ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

As noted, Petitioner made a somewhat similar claim in the trial court that various police officers who responded to the scene and witnesses they interviewed did not testify at trial. Trial counsel submitted an affidavit in which she stated that she "discussed with Mr. Sims all witness issues and received his approval before any waiver of appearance." Tr. 1399. The trial court found that Petitioner failed to provide a factual or legal basis for establishing that his due process rights were violated by the absence of any of those witnesses. Tr. 1472. Petitioner pivoted to a Brady-type claim before the Supreme Court, and it denied the claim summarily. Because the claim was denied on the merits in state court, Petitioner must overcome the heavy burden of Section 2254(d).

Petitioner's memorandum to this court fist relies on Napue v. Illinois, 79 S.Ct. 1173 (1959). That decision recognizes that due process may be denied through the use of

perjured testimony if the petitioner shows that (1) the witness gave false testimony; (2) the falsity was material in that it would have affected the jury's verdict; and (3) the prosecution used the testimony knowing it was false." Reed v. Quarterman, 504 F.3d 465, 473 (5th Cir. 2007). His reliance on Napue is misplaced because he is not contending that any of these witnesses gave false testimony; he is arguing that they did not testify at all.

Petitioner also invokes Brady, which obligates the prosecution to turn over material evidence that may be helpful to the defense. There is no indication that these witnesses were unknown to the defense. Lucky Raley was an investigator who worked for defense counsel, as evidenced by his written reports that summarize witness interviews. Tr. 1292-97. Ms. Price testified at trial and was cross-examined by defense counsel. Reports by Officers McDonald and Miller were provided to the defense as part of the discovery process. Tr. 220, 224-26. Petitioner cannot establish a Brady claim because he cannot show that the State violated its obligation to disclose evidence. The state courts' denials of this claim were not unreasonable applications of Brady, Napue, or other clearly established federal law. Habeas relief on this final claim must be denied.

Accordingly,

It is recommended that Petitioner's petition for writ of habeas corpus relief be denied.

**Objections**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an

extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

An appeal may not be taken to the court of appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice, circuit judge, or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c); F.R.A.P. 22(b). Rule 11 of the Rules Governing Section 2254 Proceedings for the U.S. District Courts requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Section 2253(c)(2). A party may, within fourteen (14) days from the date of this Report and Recommendation, file a memorandum that sets forth arguments on whether a certificate of appealability should issue.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 28th day of July, 2021.



Mark L. Hornsby
U.S. Magistrate Judge